FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 23, 2026

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| LISA S.,[1] <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, <br> Commissioner of Social Security, <br><br> Defendant. | No.   4:25-cv-5112-EFS <br><br> **ORDER AFFIRMING THE ALJ'S PARTIAL DENIAL OF DISABILITY** |

Plaintiff Lisa S. asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 16 supplemental security income for the period of March 22, 2018, to June 9, 2021. Although the record reflects that Plaintiff's impairments limit her physically and mentally,

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." See LCivR 5.2(c).

DISPOSITIVE ORDER - 1

the ALJ's nondisability finding is adequately explained and supported by substantial evidence. The ALJ's decision is affirmed.

## I.    Background

Plaintiff first filed an application for disability insurance benefits and supplemental security income (SSI) in 2013, claiming disability beginning September 1, 2010.[2] Her applications were denied initially, on reconsideration, by an ALJ, and by the Appeals Council.[3]

On March 22, 2018, Plaintiff filed the at-issue application for SSI benefits based on mental and physical impairments.[4] In support of her application, Plaintiff completed a seizure questionnaire, a headache questionnaire, and an adult function report.[5] On these forms, Plaintiff reported she has headaches almost daily, which usually last 5–6 hours and cause her to be tired and exhausted; she is able to do dishes, vacuum, sweep, take the trash out, and scoop the litter box, although it

---

[2] Administrative Record (AR) 54–89.

[3] AR 116–44.

[4] AR 256–64, 290.

[5] AR 322–43.

DISPOSITIVE ORDER - 2

takes her awhile to do these tasks and she does not do these tasks daily; she shops about once a month for 30–45 minutes; she has poor grip and will fall over if she kneels; she has lost interest in everything and is no longer social; she needs reminders for appointments and has difficulty concentrating and understanding directions; and she does not handle change well.[6]

Her application was denied initially and on reconsideration.[7] On request, ALJ Jesse Shumway held a hearing, at which Plaintiff modified her alleged onset date to her application date of March 22, 2018.[8] Plaintiff testified that she hurt her back during a fall injury in 2015 and that since then her back and leg pain have progressed.[9] She advised that since March 2018, she has only been able to stand in place for 10 minutes and that after that she will lean on a counter or stay off

---

[6] AR 327, 333–37.

[7] AR 145–86.

[8] AR 90–115, 197–99.

[9] AR 97.

DISPOSITIVE ORDER - 3

her feet and elevate her feet.[10] She stated that she alternates between sitting and standing during the day, with needing to either sit with her feet up or lay down for 30–60 minutes before standing back up for 10 minutes; and she elevates her legs about 6–10 times a day.[11] She also wears compression stockings to keep swelling down and she will nap for about an hour each day.[12] She testified that she can only lift and carry 5–10 pounds or else her wrist will shake and hurt, and her back will hurt.[13] She shared that she has been unable to ride her horse or ballroom dance in the past 5 years, and her cousin performs her yard work and feeds her horses and cleans their stalls, but she is able to water her flowers and grass by hand with a hose.[14] She can care for her companion cats and dogs.[15] She tries to attend church once or twice a

---

[10] AR 97–98.

[11] AR 98–101.

[12] AR 99, 101.

[13] AR 101, 107.

[14] AR 102–03.

[15] AR 103.

DISPOSITIVE ORDER - 4

month, attending the later service, as she is sore and stiff in the early morning.[16] She does not drive due to losing her license when she had a seizure, although she may be able to get her license back because she has not had any more seizures.[17] She spends quite a bit a time with her elderly mother each day, keeping her mother company while she rests.[18] Plaintiff's stepdad runs errands for her.[19] She shared that due to her depression she will not want to leave the house several days a month.[20] She also stated that she has headaches almost daily, which cause nausea and blurred vision; she lays down and tries to take a nap to alleviate her headaches.[21]

On June 9, 2021, the ALJ issued a decision partially awarding benefits. The ALJ granted disability for the period following the

---

[16] AR 104.

[17] AR 104–06.

[18] AR 105.

[19] AR 105.

[20] AR 109.

[21] AR 111.

DISPOSITIVE ORDER - 5

hearing based on the RFC and that Plaintiff was closely approaching advanced age, but the ALJ denied disability for the period prior to the hearing date.[22] The Appeals Council upheld the ALJ's decision, but pursuant to the borderline-age application of Medical-Vocational Rule 202.06, the Appeals Council modified the disability start date from May 26, 2021, to the June 9, 2021 ALJ decision date.[23]

Plaintiff filed a federal lawsuit, asking the Court to review the partial denial of disability.[24] The district court affirmed the ALJ's decision.[25] Plaintiff then appealed to the Ninth Circuit.[26] Thereafter, the parties agreed to a stipulated remand, and the matter was remanded to the Appeals Council.[27] The Appeals Council vacated the unfavorable portion of the final decision because the ALJ had not

---

[22] AR 15–39.

[23] AR 1–19.

[24] AR 1257–59 (E.D. Wash. No. 4:22-cv-5111-RMP).

[25] AR 1271–98.

[26] AR 1260–63.

[27] AR 1263–70.

DISPOSITIVE ORDER - 6

considered the opinion of Dr. Luci Carstens, PhD, which had initially been omitted from the administrative record, and the Appeals Council remanded the matter to the ALJ to reconsider Plaintiff's SSI application for the period prior to June 9, 2021.[28]

On remand, ALJ Shumway held two hearings, with Plaintiff testifying at the second hearing.[29] Plaintiff testified that her depression continues to limit what she can do.[30] In regard to a reference in a November 2019 medical record that she was painting her house, Plaintiff clarified that she did not paint but instead washed the brushes out, put tape on the baseboard, and did some touch up paint.[31] Plaintiff stated that she goes to her mother's house when her stepdad is at work to keep her mom company by laying down in her bed and helping around the house by watering her plants, putting dishes in the

---

[28] AR 1301–03.

[29] AR 1226–56.

[30] AR 1246.

[31] AR 1246–47.

DISPOSITIVE ORDER - 7

dishwasher, letting the dog out, and making her a "little something" to eat; Plaintiff said she does similar tasks at her own house.[32]

The ALJ again denied Plaintiff disability for the period of March 22, 2018, to June 9, 2021.[33] The ALJ found Plaintiff's alleged symptoms "not fully supported."[34] As to the medical opinions, the ALJ found:

- the examining opinion of Philip Barnard, PhD, generally persuasive.

- the reviewing opinions of Susan Moner, MD, Robert Hander, MD, Jan Lewis, PhD, and Beth Fitterer, PhD, somewhat persuasive.

- the examining opinion of Kenneth Cole, PsyD, the reviewing opinion of Luci Carstens, PhD, and the treating opinion of Jason Osborn, MD, not persuasive.[35]

---

[32] AR 1247–49.

[33] AR 1119–1214. Per 20 C.F.R. § 416.920(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[34] AR 1209.

[35] AR 1210–12.

DISPOSITIVE ORDER - 8

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since the date of application, March 22, 2018.

- Step two: Plaintiff had the following medically determinable severe impairments: attention deficit hyperactivity disorder, depressive disorder, bipolar disorder, anxiety disorder, post-traumatic stress disorder, lumbar degenerative arthritis, and non-epileptic seizure disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff could perform a full range of light work except:

  > she could not climb ladders, ropes, or scaffolds and could only occasionally perform all other postural activities; she can have no exposure to hazards (e.g., unprotected heights, moving mechanical parts) or operate a motor vehicle; she is limited to simple, routine, and repetitive tasks; she can have no contact with the public; she can work in proximity to, but [not][36] in coordination with co-workers; she can have

---

[36] The Court finds the ALJ mistakenly omitted the word "not." The word "not" was included in the ALJ's prior RFCs, included in the

DISPOSITIVE ORDER - 9

> only occasional contact with supervisors; she would have nine absences per year; and she would be off task up to 10 percent of the workday

- Step four: Plaintiff had no past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as marker, routing clerk, and production assembler.[37]

Plaintiff timely requested review of the ALJ's decision by the Court.[38]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error"[39] and such error

---

Appeals Council's RFC, and included in the hypothetical posed to the vocational expert.  AR 11, 28, 34, 124, 1250.

[37] AR 1202–15.

[38] ECF No. 1.

[39] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

DISPOSITIVE ORDER - 10

impacted the nondisability determination.[40] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[41]

---

[40] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[41] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

### III.   Analysis

Plaintiff alleges several errors by the ALJ: (1) the ALJ erred by invoking the *Chavez* presumption regarding Plaintiff's mental impairments despite new information indicating Plaintiff was more limited; (2) the ALJ improperly evaluated the medical opinions; (3) the ALJ erred in rejecting Plaintiff's subjective complaints; and (4) the ALJ failed to conduct an adequate step-five analysis. In response, the Commissioner argues no error occurred and that substantial evidence supports the ALJ's decision. Each of the arguments is addressed below.

**A.     *Chavez*: Substantial evidence supports the ALJ's finding.**

Plaintiff argues the ALJ should have applied *Chavez v. Bowen*[42] and its presumption of continuing nondisability regarding her mental impairments and resulting limitations because the medical evidence indicates her mental impairments worsened during the relevant period. In response, the Commissioner argues the ALJ properly applied the *Chavez* presumption of continuing non-disability as to Plaintiff's mental impairments, as the ALJ properly found the opinions from

---

[42] 844 F.2d 691 (9th Cir. 1988).

DISPOSITIVE ORDER - 12

Dr. Cole and Dr. Carstens not persuasive.

Pursuant to *Chavez* and Acquiescence Ruling 97-4(9), there is a continuing presumption of non-disability that applies to a subsequent application for disability filed by a claimant who was previously found not-disabled. Yet, this presumption of continuing nondisability is rebutted if the claimant establishes "changed circumstances."[43] Some ways for the claimant to establish "changed circumstances" include an increase in the severity of the claimant's impairment, a change in the claimant's age category, or a new issue raised by the claimant, such as the existence of an impairment not considered in the previous application.[44] Plus, the changed circumstance must be material, in that "there is a reasonable possibility that the new evidence would have changed the outcome" of the Commissioner's determination.[45]

---

[43] *Chavez*, 944 F.2d 691; Acquiescence Ruling 97-4p(9).

[44] Acquiescence Ruling 97-4p(9).

[45] *Booz v. Sec'y of Health & Human Servs.*, 734, F.2d 1378, 1380 (9th Cir. 1984) (quoting *Dorsey v. Heckler*, 702 F.2d 597, 60405 (5th Cir. 1983)).

DISPOSITIVE ORDER - 13

The medical record shows that Plaintiff continued to be impacted by the same severe mental-health impairments found by the ALJ in 2015: ADHD, depressive disorder, bipolar disorder, anxiety disorder, and PTSD.[46] In connection with her prior application, Plaintiff reported problems with focus, crying, insomnia, emotional instability, being reclusive and anti-social, memory difficulties, and little motivation to do daily activities and personal hygiene.[47] Plaintiff reported similar mental-health symptoms in connection with the current application.

ALJ Shumway found that Plaintiff did not present new and material evidence of deterioration of her psychological functioning, nor any other changed circumstances, during the at-issue period and therefore adopted the moderate mental limitations from the 2015 decision.[48] ALJ Shumway reached this finding after fully considering the treatment records and each of the psychological opinions, including those authored by Dr. Cole and Dr. Carstens, who opined marked

[46] AR 121, 1205.

[47] AR 125.

[48] AR 1203.

DISPOSITIVE ORDER - 14

limitations as to four basic work abilities. The ALJ discounted these marked limitations, finding that only moderate limitations were supported by the record. As is discussed below, the ALJ's finding that Dr. Cole's and Dr. Carstens' marked limitations are unsupported by and inconsistent with the record is supported by substantial evidence. Therefore, like he did in 2015, ALJ Shumway found Plaintiff's mental-health impairments to cause only moderate limitations in each of the then-relevant paragraph B criteria.[49] The ALJ's decision to "again adopt the mental limitations from the prior ALJ's decision of 2015" was proper.[50]

Moreover, the ALJ's evaluation of Dr. Carstens' opinion fulfilled the Ninth Circuit's and the Appeals Council's directive that the ALJ "consider the more restrictive opinion of Dr. Carstens."[51] The ALJ considered her opinion and found Dr. Carstens' more restrictive opinions unsupported and inconsistent with the medical record, a

---

[49] AR 123, 1207–08.

[50] AR 1203.

[51] AR 1302.

DISPOSITIVE ORDER - 15

finding that is supported by substantial evidence and is adequately explained.

**B.    Medical Opinions: Plaintiff fails to establish consequential error.**

Plaintiff argues the ALJ erred by rejecting the opinion by treating physician Dr. Osborn, the examining opinion by Dr. Cole, and the reviewing opinion by Dr. Carstens. The Commissioner counters that substantial evidence supports the ALJ's evaluation of the medical opinions.

1.    <u>Standard</u>

The ALJ must consider and articulate how persuasive he found each medical opinion and prior administrative medical finding, including whether the medical opinion or finding was consistent with and supported by the record.[52] The factors for evaluating the persuasiveness of the medical opinions include, but are not limited to, supportability, consistency, relationship with the claimant, and

---

[52] 20 C.F.R. § 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

DISPOSITIVE ORDER - 16

specialization.[53] Supportability and consistency are the most important factors:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[54]

When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[55]

### 2.    Dr. Osborn

In March 2021, Dr. Osborn completed a medical opinion form at the request of Plaintiff's counsel.[56] Dr. Osborn wrote that he diagnosed

---

[53] 20 C.F.R. § 416.920c(c)(1)–(5).

[54] *Id.* § 416.920c(c)(1)–(2). *See also id.* § 416.920c(b)(2).

[55] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[56] AR 1142–44.

Plaintiff with chronic low back pain, which since January 2020 caused severe low back and bilateral leg pain, tenderness of both legs, numbness of the legs, swelling of the bilateral calves, decreased sensation in the bilateral thighs, and knee pain.[57] He opined Plaintiff had to lie down several hours each day because of pain and swelling, that work on a regular and continuous basis would cause worsening pain, she would miss more than 4 days of work per month, and she would likely be off-task and unproductive less than 12% of a workweek.[58] He recommended that Plaintiff be limited to sedentary work.[59]

In addition to Dr. Osborn's opinion, the record contains reviewing opinions from Dr. Monder dated June 2018, and Dr. Hander dated March 2020.[60] Both Dr. Monder and Dr. Hander opined that Plaintiff could stand, sit, and/or walk for 6 hours a day, occasionally lift and

---

[57] AR 1142, 1144.

[58] AR 1142–44.

[59] AR 1143.

[60] AR 146–182.

carry 50 pounds, frequently lift and carry 25 pounds, should avoid hazards, and never climb ladders, ropes, or scaffolds.

The ALJ found Dr. Osborn's opinion not persuasive because it (1) did not apply to the period before January 2020; (2) was unsupported by his own charts, and (3) was inconsistent with Plaintiff's reported activities of daily living. [61] While the ALJ adopted Dr. Moner's and Dr. Hander's opinions that Plaintiff could sit, stand, and/or walk for 6 hours a day and should avoid hazards and not climb ladders, ropes, or scaffolds, the ALJ determined that Plaintiff should be limited to occasional performance of all postural activities, that her seizure condition warranted preclusion of driving, and that her lumbar degenerative arthritis called for more restrictive carrying and lifting limitations.

### a.    *Applicable period for the opined limitations*

Although Dr. Osborn treated Plaintiff since July 2019, he opined that Plaintiff's limitations began January 2020. Based on Dr. Osborn's opined start date for the limitations, the ALJ reasonably limited

---

[61] AR 1212.

Dr. Osborn's opinion to the period after January 2020. Therefore, the Court's analysis of whether the ALJ's evaluation of Dr. Osborn's opinion is supported by substantial evidence largely focuses on the period of January 2020–June 2021; however, Dr. Osborn's prior treatment notes and the imaging prior to that period are relevant for context.

### b.    *Dr. Osborn's treatment notes*

Dr. Osborn began treating Plaintiff in July 2019, when he saw Plaintiff twice. The first appointment was a follow-up from emergency treatment for low back pain and imaging that revealed: (1) grade 1 degenerative anterolisthesis at L4-5 with increasing disc space narrowing; (2) moderate to severe disc space narrowing at the lumbar disc levels; and (3) severe hypertrophic facet osteoarthrosis at L3-4 and L4-5.[62] Plaintiff presented to Dr. Osborn as anxious, with full muscle strength and range of motion, normal gait and station, and hypertonicity of bilateral lumbar paraspinal musculature with right

---

[62] AR 1164-1166, 1180–81.

DISPOSITIVE ORDER - 20

sacroiliac (SI) joint tenderness.[63] Dr. Osborn determined that Plaintiff would benefit from osteopathic manipulative treatment (OMT).[64]

The next week, Plaintiff attended the first OMT session for her chronic low back pain and pain in the posterior/medial right knee.[65] She presented with an appropriate gait, normal mental health, and:

> hypertonicity of bilateral lumbar spine from L1-L5. L2-L5 RLSR. Tenderness 6/10 near [right] transverse process of L5. R innominate anteriorly rotated. Hypertonicity just medial to the R tibial plateau.[66]

On August 13, 2019, a colleague of Dr. Osborn's conducted an OMT session.[67] Plaintiff presented with an appropriate gait, cervical paraspinal hypertonicity with ropey texture, lumbar paraspinal hypertonicity, and restricted lumbar range of motion; she was advised to elevate her legs at nighttime to assist with reported edema of the

---

[63] AR 1116–19.

[64] AR 1119.

[65] AR 1112–15.

[66] AR 1114.

[67] AR 1109–12.

lower extremity.[68] The same provider conducted OMT again later in August, during which Plaintiff presented with an appropriate gait, tenderness to the paraspinal musculature of the cervical, thoracic, and lumbar regions, restricted extension in the neck, ropey tissue texture changes in the lower thoracic and upper lumbar regions, and restrictions in the hamstrings and IT band. Home stretching and physical therapy were again recommended.[69]

In late October 2019, Dr. Osborn provided OMT. Plaintiff reported her back pain was worse when she was laying down and prevented her from being able to ride her horse.[70] He noted normal mental-health findings, hypertonicity of midflow thoracic musculature on the [left] Type 1 somatic dysfunction of thoracic spine from T10-L2

---

[68] AR 1111-12.

[69] AR 1104.

[70] AR 1094.

(NRLSR), and "tenderness of transverse processes of T12-L1.[71] He recommended stretching.[72]

Dr. Osborn saw Plaintiff again in November 2019 for mid-back pain caused by "painting her house the past few days and doing a lot of reaching."[73] Dr. Osborn observed Plaintiff with normal judgment, insight, memory, mood, and affect, and:

> hypertonicity of mid thoracic musculature on the [left]. Type 1 somatic dysfunction of thoracic spine from T10-L2 (NRLSR). Tenderness of L transverse processes of T12-L1. T2 F RRSR with tenderness over transverse process. T4 FRLSL with tenderness over L transverse process.[74]

After the OMT, Plaintiff demonstrated improvement in range of motion and Dr. Osborn recommended stretching.[75]

---

[71] AR 1094.

[72] AR 1094.

[73] AR 1089.

[74] AR 1091.

[75] AR 1091.

DISPOSITIVE ORDER - 23

Dr. Osborn treated Plaintiff twice in January 2020. The first was a medication follow-up for back pain.[76] Plaintiff presented with normal gait and station, with fair insight, and as talkative and slightly tangential.[77] Dr. Osborn recommended that Plaintiff still stretch frequently and noted that the referral for physical therapy was pending.[78] The second January appointment was for foot pain and weight gain, which Plaintiff suspected was the side effect of her bipolar disorder medication.[79] Dr. Osborn observed her to ambulate and stand normally, with tangential thoughts, crying and laughing intermittently, and as anxious, depressed, and very upset about her weight gain.[80]

---

[76] AR 1079–82.

[77] AR 1081.

[78] AR 1082.

[79] AR 1076–79.

[80] AR 1078.

Plaintiff followed up with Dr. Osborn nine months later, in September 2020, for fatigue and right ankle pain.[81] She reported that she tripped over an electric fence in June 2020, but she felt that her pain was not related to that incident.[82] Dr. Osborn observed Plaintiff with a normal gait and station, with equal calf sizes and mild edema of her right ankle, with reduced active range of motion in her right ankle in inversion and flexion. He suspected that her right lower extremity pain may be related to her chronic low back pain and he ordered a nerve conduction study.[83]

Plaintiff did not follow through with the nerve conduction study. On March 3, 2021, Plaintiff again saw Dr. Osborn for chronic bilateral lower extremity and low back pain.[84] Dr. Osborn noted that Plaintiff's speech was clear and organized; she had appropriate affect, judgment,

---

[81] AR 1072–75.

[82] AR 1074.

[83] AR 1075.

[84] AR 1061–64.

and mood; and her musculoskeletal examination revealed 2+ non pitting edema and:

> Reduced flexion of the [left] knee 2/2 pain. No joint laxity or erythema of either knee. Point tenderness over L lateral knee at insertion of pes anserinus. Pt winces in pain with palpation of her calves, however when I did ABI's with BP cuff she did not complain of pain when pumped up to 180 mmHg. Of note, pt able to ambulate independently with slight limp, was also able to climb up on exam table without assistance.[85]

Dr. Osborn noted fairly good range of movement with flexion and extension in her back and that Plaintiff had a balanced and coordinated gait.[86] He re-ordered nerve conduction studies to rule out peripheral neuropathy and ordered an x-ray of her left knee.[87] He suspected that her left knee pain was caused by her compensating for her left ankle pain after twisting her ankle in December 2020.[88] He wrote that she would "likely benefit from [physical therapy] and weight

---

[85] AR 1063.

[86] AR 1064.

[87] AR 1064.

[88] AR 1064.

DISPOSITIVE ORDER - 26

loss, as well as continued stretching."[89] Dr. Osborn conversed with Plaintiff about the dangers of taking her mother's pain medicine, and noted that Plaintiff was "feeling very frustrated as she left."[90] He wrote that Plaintiff "was exhibiting pain medication seeking behavior, when attempting to provide alternative options she would state by name medications that did not help her in order to get SOMA."[91]

X-rays of both knees were performed on March 8, 2021.[92] The x-ray of the right knee revealed medial femoral-tibial compartment joint space narrowing; although based on subsequent imaging in June 2021, it appears that it may have been the left knee x-ray that was abnormal, rather than the right knee x-ray.[93]

---

[89] AR 1064.

[90] AR 1064.

[91] AR 1064.

[92] AR 1124–25.

[93] AR 1125.

DISPOSITIVE ORDER - 27

Dr. Osborn completed the Medical Report listing his opinions on March 10, 2011.[94]

Two days after the ALJ's awarded disability onset of June 9, 2021, Plaintiff sought treatment for swelling and pain in her left knee with Benton Franklin Orthopedic Associates. Plaintiff presented with mild discomfort during the upward motion of the squatting exercise; her left knee revealed no effusion, erythema, or ecchymosis; she had an intact neurovascular exam and good range of flexion motion; and she had a positive patella grinding test and the provider was able to reproduce pain with palpation over the bony prominences within the medial and lateral compartments of her left knee near the articular surface.[95] The provider wrote that Plaintiff's knee x-rays from March 8, 2021, revealed medial joint space narrowing and that the imaging taken on June 11, 2021, revealed significant medial joint space narrowing so that she was near bone-on-bone contact within the medial

---

[94] AR 1142–44.

[95] AR 2115.

compartment.[96] Upon Plaintiff's request, a cortisone injection to her left knee was provided and within a few minutes the provider observed her to be ambulating more comfortably.[97]

On August 11, 2021, Plaintiff saw Dr. Osborn for a follow-up for wasp stings and contact with plant thorns on her right leg.[98] Other than the healing wounds and mild erythema near the wounds, the physical examination and psychiatric assessment were normal.

In September 2022, Plaintiff returned to Benton Franklin Orthopedic Associates for left knee pain, reporting that she noticed a significant improvement with the cortisone injection in June 2021 and would like a repeat injection.[99] She was observed sitting comfortably and ambulating with a steady gait; there was a positive patellar grinding test and pain was reproduced with palpation over the bony prominences in the medial compartment of her knee near the articular

---

[96] AR 2115–16.

[97] AR 2116.

[98] AR 1965–69.

[99] AR 2120–21.

surface and the lateral recess of her patella; the exam revealed no effusion, erythema, or ecchymosis, and intact neurovascular and soft tissue envelope.[100] A cortisone injection was given.

When considering this medical record against Dr. Osborn's opined limitations, the ALJ found them "inconsistent with his own chart notes, which consistently document the claimant's normal gait and no motor or neurological deficits."[101] Plaintiff takes issue with the ALJ's focus on Plaintiff's normal gait and lack of motor or neurological deficits, contending that the abnormal findings during OMT sessions, imaging, and other appointments support Dr. Osborn's opinion that Plaintiff needs to lie down and elevate her legs and can only perform sedentary work.

The ALJ had the responsibility to evaluate the conflicting medical records and medical opinions. For instance, Dr. Hander, who reviewed the medical records in March 2020 found that Plaintiff could perform

---

[100] AR 2121.

[101] AR 1212.

DISPOSITIVE ORDER - 30

light work with less restrictions than the ALJ's RFC contained.[102] The ALJ determined that the treatment records, including Dr. Osborn's treatment records, supported limiting Plaintiff to light work with lifting limitations, occasional posturals, no driving, and no hazards. Substantial evidence supports the ALJ's evaluation of Dr. Osborn's treatment notes and opinions.

Although Dr. Osborn observed tenderness and hypertonicity, he did not observe impairment of Plaintiff's gait or station or a neurological deficit. The ALJ permissibly considered whether Plaintiff's observed tenderness and other abnormal findings impacted her gait and station or caused a neurological deficit. The ALJ also mentioned earlier in his decision that in May 2021 Plaintiff was observed again with "a non-ataxic gait, normal deep tendon reflexes in the lower extremities, normal pinprick testing, and normal straight-leg raises tests. She was also able to walk independently on her heels and toes

---

[102] Dr. Monder reviewed the medical record in June 2018, closer to the beginning of the at-issue period. She recommended the same light-work lifting and postural limitations as Dr. Hander. AR 158.

DISPOSITIVE ORDER - 31

and hop independently on either leg."[103] Also, the ALJ highlighted that Plaintiff had not attended the previously prescribed physical therapy.[104] In addition to recommending physical therapy and nerve conduction testing, both of which Plaintiff did not seek out during the relevant period, Dr. Osborn recommended conservative treatment—stretching. Moreover, following the disability onset date of June 9, 2021, Plaintiff's knee pain was alleviated for more than a year by a cortisone injection; thus, even if the ALJ's supportability analysis contains error, Plaintiff is unable to establish that such error consequentially impacted the RFC.

Substantial evidence supports the ALJ's determination that Dr. Osborn's treatment notes do not support his limitation to sedentary work, the need to elevate Plaintiff's legs during the workday, and attendance and off-task problems.

---

[103] AR 1211 (citing AR 1985).

[104] AR 1211 (citing AR 1990); AR 2123 (Oct. 2022: Plaintiff has not undergone physical therapy for her lower back).

c.    *Plaintiff's activities of daily living*

Plaintiff's comments to Dr. Osborn reflect some of her activities during this period. For instance, in October 2019, Plaintiff told Dr. Osborn that she was unable to ride her horse because of her back pain and that her pain was worse when laying down.[105] During the November 2019 appointment, Plaintiff reported that her back pain was related in part to "painting her house the past few days and doing a lot of reaching."[106] During the September 2020 appointment, Plaintiff referenced tripping over an electric fence.[107]

Substantial evidence supports the ALJ's determination that Plaintiff's reported activities to Dr. Osborn were inconsistent with his opined limitations. Plaintiff's statements to Dr. Osborn reflect that, although she could not ride her horse, she remained active with caring for her horse, as was evident by her incident tripping over the electric fence. Moreover, regardless of the extent of Plaintiff's involvement with

---

[105] AR 1094.

[106] AR 1091.

[107] AR 1074.

painting, which she sought to clarify during the last hearing, her contemporaneous statements to Dr. Osborn reflect that he understood that she engaged in painting-related activities for several days, and that even though she engaged in these activities, she presented with an appropriate gait and the recommended treatment for her tender back was stretching, ice, anti-inflammatory medications, and aggressive hydration. Dr. Osborn did not recommend being sedentary or elevating her feet. In fact, as reported by Plaintiff in October 2019, her back pain worsened when she was laying down, and the other OMT provider only recommended that Plaintiff elevate her feet at night time to reduce edema.

Substantial evidence supports the ALJ's finding that Dr. Osborn's opined limitations are inconsistent with Plaintiff's reported activities.

3.    Dr. Cole, Dr. Barnard, and Dr. Carstens

Plaintiff argues the ALJ erred by finding Dr. Barnard's opinion more persuasive than Dr. Cole's and Dr. Carstens' opinions; whereas the Commissioner argues the ALJ properly found Dr. Cole's and Dr. Carstens' opinions not persuasive. As discussed below, substantial evidence supports ALJ's evaluation of these opinions.

### a.   *Dr. Barnard*

In March 2018, Dr. Barnard conducted a Psychological/Psychiatric Evaluation for Washington State Department and Health Services.[108] Dr. Barnard reviewed the nine listed documents, conducted a clinical interview, and conducted a mental status examination with the following testing: digit-span testing, fund-of-knowledge testing, Wechsler Memory Scale-IV, WAIS-IV, and Halstead's Trail Making Test. Dr. Barnard's findings were normal, except as to Plaintiff's perception as she reported that she has experienced hallucinations, her memory was abnormal because she only recalled one word out of three words after a five-minute delay, her insight/judgment were limited, and the Wechsler Memory Scale-IV testing revealed results in either the borderline or low average ranges.[109] Plaintiff advised Dr. Barnard that she uses marijuana daily.

Dr. Barnard diagnosed Plaintiff with persistent depressive (dysthymic) disorder and found that her depression would impact her

---

[108] AR 798–803.

[109] AR 802–03.

ability to work on a daily basis to a moderate extent.[110] He opined that Plaintiff was moderately limited in her abilities to adapt to changes in a routine work setting, make simple-work related decisions, be aware of normal hazards and take appropriate precautions, communicate and perform effectively in a work setting, maintain appropriate behavior in a work setting, complete a normal work day and workweek without interruptions from psychologically based symptoms, and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances without special supervision.[111] Dr. Barnard recommended weekly counseling to assist Plaintiff with her depression and opined that she would be impaired for a minimum of 12 months and a maximum of 24 months.

       b.    _Dr. Cole_

Dr. Cole completed a Psychological/Psychiatric Evaluation of Plaintiff in February 2019 for the Washington State Department of

---

[110] AR 800.

[111] AR 901.

Social and Health Services.[112] Dr. Cole reviewed a single record, conducted a clinical interview, and conducted a mental status examination, which included administering the Beck Anxiety Inventory, Beck Depression Inventory-II, and Halstead's Trail Making Test, and Rey-15 Memory Test. Dr. Cole noted that Plaintiff tended to ramble when answering questions, that she was unable to recall any of the three words after a five-minute delay, that she did not know the governor nor which states bordered Washington, and she had two errors when completing Part B of the Halstead test. Her insight/judgment and abstract-thought testing were abnormal. Dr. Cole wrote: "The question about drug and alcohol use brought the response that [Plaintiff] used marijuana and imbibed in alcohol as a teenager. She discontinued her substance use part of the way through her pregnancy because she wanted the baby to be healthy. [She] later tried most drugs except for heroin."[113]

---

[112] AR 805–09.

[113] AR 806.

DISPOSITIVE ORDER - 37

Dr. Cole diagnosed Plaintiff with generalized anxiety disorder and persistent depressive disorder. He opined that Plaintiff was markedly limited as to being aware of normal hazards and taking appropriate precautions, completing a normal work day and workweek without interruptions from psychologically based symptoms, setting realistic goals and planning independently, and understanding, remembering, and persisting in tasks by following detailed instructions. He opined that Plaintiff was moderately limited in making simple work-related decisions; understanding, remembering, and persisting in tasks by following very short and simple instructions; performing activities within a schedule; and maintaining regular attendance. Dr. Cole opined that Plaintiff's overall severity rating was moderate and that the duration of her impairment was at least 6 months but a maximum of 12 months. He recommended that she engage in weekly therapy.

    c.    *Dr. Carstens*

In March 2019, Dr. Carstens completed a Review of Medical Evidence form, listing that she reviewed Dr. Cole's and Dr. Barnard's

DISPOSITIVE ORDER - 38

opinions.[114] Dr. Carstens agreed that Dr. Cole's diagnosis of dysthymia and generalized anxiety disorder were supported by his observations and findings, and agreed that Dr. Cole's severity ratings were supported but concluded that a longer duration of 18-24 months, rather than 6-12 months, should be considered.[115] Dr. Carstens did not mention Dr. Barnard's findings.

### d.    _ALJ's findings_

The ALJ found Dr. Barnard's opinion "generally persuasive, as the limitations he assessed are supported by his own observations and consistent with the record overall showing low-frequency mental health treatment and largely intact mental status examinations."[116] The ALJ did not find Dr. Cole's opinion persuasive:

> as he provided no meaningful explanation for his ratings, particularly those that involve marked limitations, and he did not [do] as much testing as Dr. Barnard. His conclusions are unsupported by his own remarks and inconsistent with

---

[114] AR 2148–49.

[115] AR 2148.

[116] AR 1209.

the records showing primarily normal mental status examinations.[117]

The ALJ found Dr. Carstens' opinion unpersuasive for the same reasons he found Dr. Cole's opinion unpersuasive, and because Dr. Carstens' "conclusion essentially involves an issue reserved to the Commissioner, and she presumably utilized the regulations of her employer (DSHS) in arriving at her conclusion."[118]

### e.    *Support for the medical opinions*

Substantial evidence supports the ALJ's finding that Dr. Barnard had more support for his opinion than Dr. Cole (and Dr. Carstens) did for his opinion. First, the ALJ explained that the additional testing performed by Dr. Barnard provides more support for his opinion than Dr. Cole's. Although there is some overlap between Dr. Barnard's and Dr. Cole's opinions in that they both deemed Plaintiff to be moderately limited overall by her depression, Dr. Cole deemed Plaintiff to be markedly limited in four working abilities. The reports indicate that

---

[117] AR 1209–10.

[118] AR 1210.

both Dr. Barnard and Dr. Cole asked delayed-recall questions, similar parable questions, the same insight/judgment question, and the same fund-of-knowledge questions, such as who the President of the United States is, who the Governor of Washington is, the states that border Washington, how to spell World forward and backward, and digit-span tests.[119] They both also conducted the Halstead's Trail Making Test Part A and B, and Dr. Cole performed a Rey-15 Item Memory Test, while Dr. Barnard performed the Test of Memory Malingering (TOMM), the Wechsler Memory Scale-IV memory test, and the WAIS-IV fund-of-knowledge test.[120] The ALJ reasonably determined that Dr. Barnard based his assessment on more testing than Dr. Cole performed, and as such there was more support for Dr. Barnard's opined limitations.[121] Moreover, Dr. Barnard reviewed more medical

---

[119] AR 803, 808–09.

[120] AR 803.

[121] *Lingenfelter*, 504 F.3d at 1042 (recognizing that a medical opinion is evaluated as to the amount of relevant evidence that supports the

DISPOSITIVE ORDER - 41

records, including a psychiatric assessment done by treating provider Laurie Zimmerman, MD, in 2013 along with medication management reports she authored.[122]

### f.    *Consistency with mental status examinations and treatment*

Plaintiff challenges the ALJ's characterization that the records show "primarily normal mental status examinations."[123] Plaintiff highlights treatment records showing that she was depressed, anxious, and tearful and had tangential thoughts, an irritable mood, and impaired concentration, attention, and memory. Plaintiff's summary of the highlighted records is accurate; during many appointments, Plaintiff was observed with impaired mood, concentration, attention, thought process, and/or memory.[124] However, simply because one has

---

opinion, the quality of the explanation provided in the opinion, and the consistency of the medical opinion with the record as a whole);.

[122] AR 798; *see also* AR 820–28.

[123] AR 1210.

[124] *See, e.g.*, AR 974–77, 1078–79, 1127–32, 1645.

DISPOSITIVE ORDER - 42

impaired mental status evaluations does not necessarily equate to a finding that the claimant's mental status is impacted to such an extent that she is unable to complete a normal workday and workweek without interruptions from psychologically based symptoms or to remain on task.

For instance, even though Plaintiff presented with an impaired mood, perception, memory, abstract thought, and insight/judgment during her evaluation with Dr. Barnard, Dr. Barnard found that her limitations only moderately impaired the identified work activities. It was the ALJ's duty to weigh the conflicting medical opinions against the treatment records, which reflected waxing and waning of mental-health symptoms. The ALJ did so with findings that were adequately explained, allowing the Court to understand the ALJ's findings, which are supported by substantial evidence. While the ALJ could have made a different assessment as to whether Dr. Cole's and Dr. Carstens' opinions were more supported by the mental health treatment records than Dr. Barnards' opinion, the Court here understands the explanation given by the ALJ for his evaluation of the mental health treatment records and opinions—an evaluation that is supported by

substantial evidence. This substantial-evidence determination is made even without considering Plaintiff's daily use of marijuana.[125]

The ALJ reasonably crafted an RFC that limits Plaintiff to simple, routine, and repetitive tasks, precludes driving, and allowed no contact with the public, occasional contact with supervisors, and work

[125] *See, e.g.*, AR 800, 1149, 1156, 1160, 1179, 1786, 2114. The ALJ did not rely on Plaintiff's daily marijuana use as a basis to discount either her reported symptoms or to find Dr. Cole's and Dr. Carstens' opinions less supported. However, the medical record reflects daily marijuana use by Plaintiff during the at-issue period and that Dr. Cole did not have access to this information. Although the Court is limited to the reasons given by the ALJ when evaluating the medical opinions, the Court considers the entirety of the record to assess whether a claimed error consequentially impacted the ALJ's non-disability finding. Therefore, even if the ALJ erred in finding that Dr. Barnard's opinion is consistent with the mental status examinations and treatment, the Court would find such error did not consequentially impact the non-disability finding.

in proximity to and not in coordination with coworkers: an RFC that is more restrictive than Dr. Barnard's opinion and less restrictive than Dr. Cole's and Dr. Carsten's opinions.[126]

### g.    *Purpose for which Dr. Carstens' opinion was authored*

The ALJ gave less consideration to Dr. Carstens' opinion because it was issued for DSHS purposes and "presumably utilized the DSHS regulations in arriving at her conclusion" and because it "essentially involves an issue reserved to the Commissioner."[127] Although Dr. Carstens' opinion does not contain functional limitation findings of her own, she incorporated the limitation findings made by Dr. Cole and indicated that such limitations are supported by Dr. Cole's report.[128] The incorporation of Dr. Cole's functional limitations is sufficient to constitute a medical opinion by Dr. Carstens. Dr. Carstens' report

---

[126] "[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).

[127] AR 1210.

[128] AR 2148.

offered more than mere statements to issues reserved to the Commissioner under 20 C.F.R. § 416.920b(c); she agreed with Dr. Cole's opinions as to Plaintiff's impairment-related limitations.[129] Therefore, Dr. Carstens' opinion constitutes a medical opinion, and like the Appeals Council directed, the ALJ was required to evaluate Dr. Carstens' opinion even though it was issued for DSHS purposes.[130]

Although the ALJ erred by stating that Dr. Carstens' opinion was essentially on an issue reserved to the Commissioner and by presuming that Dr. Carstens utilized a different evaluation standard, the ALJ still did evaluate Dr. Carstens' opinion. The ALJ's finding that Dr. Carstens' opinion was not persuasive is supported by substantial evidence because "she adopted verbatim the opinion of Dr. Cole so her opinion stands or falls based on the persuasiveness of Dr. Cole's opinion."[131] Because the ALJ's reasons to find Dr. Cole's opinion less supported and more inconsistent with the medical evidence than

---

[129] 20 C.F.R. § 416.9313(1)(2).

[130] *Id.* § 416.904.

[131] AR 1210.

Dr. Barnard's opinion are supported by substantial evidence, the ALJ's decision to discount Dr. Carstens' opinion is likewise supported by substantial evidence.

**C.    Symptom Reports: Plaintiff fails to establish consequential error.**

Plaintiff argues the ALJ improperly rejected her subjective complaints by providing little more than vague assertions that Plaintiff's allegations are unsupported by the objective medical evidence. However, consistent with the Commissioner's position, the ALJ's key reasons for discounting Plaintiff's reported symptoms were clearly explained and supported by substantial evidence.

### 1.    Standard

After finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work.[132] Factors the ALJ may consider when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms include: 1) objective medical

---

[132] 20 C.F.R. § 416.929(c).

evidence, 2) daily activities; 3) the location, duration, frequency, and intensity of pain or other symptoms; 4) factors that precipitate and aggravate the symptoms; 5) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; 6) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; and 7) any non-treatment measures the claimant uses or has used to relieve pain or other symptoms.[133]

If the ALJ finds inconsistency between the claimant's reported symptoms and the evidence, the ALJ must identify what symptom claims are being discounted and clearly and convincingly explain the rationale for discounting the symptoms with supporting citation to evidence.[134] This requires the ALJ to "show his work" and provide a

---

[133] *Id.* § 416.929(c)(2), (3). *See also* 3 Soc. Sec. Law & Prac. § 36:25, Consideration of objective medical evidence (2025).

[134] *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022); 20 C.F.R. § 416.929(c); *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); Soc. Sec. Rlg. 16-3p, 2016 WL 1119029, at *7.

"rationale . . . clear enough that it has the power to convince" the reviewing court.[135]

### 2. The ALJ's reasons

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not fully supported."[136] First, the ALJ found that Plaintiff's "allegations of limitation also tend to be discredited by her engagement in narcotic-seeking behavior and exaggerated pain complaints," as the ALJ determined such reflected malingering.[137] Second, the ALJ found Plaintiff's "weak work history also suggests that the explanation of her ongoing unemployment was likely something of longer standing than her medical conditions."[138] Third, the ALJ found Plaintiff's reported symptoms inconsistent with her activities of daily living. Fourth, the ALJ found the medical record inconsistent with Plaintiff's reported

---

[135] *Smartt*, 53 F.4th at 499 (alteration added).

[136] AR 1209.

[137] AR 1211.

[138] AR 1212.

mental-health limitations because (1) she generally reported a "pretty good" mood to providers; (2) sought infrequent mental health treatment; (3) generally had normal mental status examination; and (4) rarely had severe abnormalities.[139] Finally, the ALJ found Plaintiff's reported need to elevate her feet several times a day and need for assistance to perform her daily activities inconsistent with the examinations findings.[140]

### 3.    Evidence of malingering

The tendency to exaggerate or engage in manipulative conduct to seek prescribed medication is a permissible reason to discount the claimant's reported pain and other symptoms.[141]

---

[139] AR 1209.

[140] AR 1211.

[141] *See Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001) (holding that evidence of drug seeking behavior undermines a claimant's reported symptoms); *Gray v. Comm'r, of Soc. Sec.*, 365 F. App'x 60, 63 (9th Cir. 2010) (recognizing that evidence of drug-seeking

Here, the ALJ found Plaintiff's disabling allegations discredited by her exaggeration of symptoms in hopes of obtaining narcotics during the March 2021 appointment with her treating provider, Dr. Osborn.[142] At the time of this appointment, Dr. Osborn had treated Plaintiff for about a year-and-a-half for her reported leg and back pain. During the treatment history, he observed her with back and knee tenderness, lumbar and thoracic hypertonicity, edema, and reduced movement in the lower extremity and neck. During the March 2021 appointment, Plaintiff reported that she took her mother's pain medication and she sought to have Dr. Osborn prescribe her opioid pain medication. Dr. Osborn noted that Plaintiff was "exhibiting pain medication seeking behavior" and that she was "feeling very frustrated as she left."[143] Given these notations by and concerns of Dr. Osborn notwithstanding his treatment history with Plaintiff, the ALJ

---

behavior is a valid reason for discounting a claimant's symptom claims).

[142] AR 1211 (relying on AR 1061–65).

[143] AR 1064.

reasonably discounted Plaintiff's reported pain, need to elevate her legs during the day, and other extreme limitations.[144]

4. Weak work history

An ALJ may consider whether a claimant's weak work history suggests a lack of motivation to work.[145]

Here, Plaintiff had no earnings since 2011 (ages of 44/45), and for the six years prior to that, Plaintiff earned between $745.96 to

---

[144] The record reflects this was not Plaintiff's first time taking her mother's pain medication. In September 2016:

> [Patient (Pt)] also admitted to taking some of her mother's pain medications, with her permission. She also reports to buying various [mental health] meds off the street at different times when she's needed them while not seeing Trudy. [Case manager (CM)] explained to her she needs to stop doing this immediately. This CM explained to her that not only is it illegal, but it is not good for her overall health when meds cannot be properly managed by a professional. Pt understood and acknowledged.

AR 425.

[145] 20 C.F.R. § 416.929 (work record can be considered in assessing reported symptoms); *see Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

DISPOSITIVE ORDER - 52

$9,976.91 per year.[146]  This earnings record does not reflect a strong desire to work. Moreover, there is no mention that during the pre-application years Plaintiff helped care for others or otherwise engaged in endeavors reflecting service or a desire to work full-time. Substantial evidence supports the ALJ's decision to discount Plaintiff's more exaggerated symptom reports based on her poor work history.

5.    Activities of daily living

The ALJ may discount a claimant's reported disabling symptoms if she can spend a substantial part of the day engaged in pursuits inconsistent with the reported disabling symptoms or involving the performing of work-related functions.[147] However, the ALJ must consider whether the nature of the activities allows for frequent breaks that would be inconsistent with maintaining a daily work schedule and

---

[146] AR 273.

[147] *Molina*, 674 F.3d at 1113.

should not penalize the claimant for attempting to engage in normal life activities.[148]

Here, the ALJ highlighted that Plaintiff's reports of being able to stand for only 10 minutes at a time, being limited to lifting 10 pounds, needing to elevate her legs several times a day, and needing assistance to perform her daily activities were inconsistent with her "Function Report and [statements] to providers that she lived alone, cared for animals, had no problems with personal care, prepared meals, washed dishes, vacuumed, swept, took out the trash, cleaned the litter box, drove, rode horses, spent time with friends, attended church, and shopping in stores" and her testimony that she did chores at her mother's house when her stepfather was at work.[149] The ALJ's reliance on Plaintiff riding horses to discount her symptom reports was in part error; in late October 2019, Plaintiff told Dr. Osborn that she could not

[148] *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014); *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

[149] AR 1211.

ride her horse due to back pain.[150] Nonetheless, the ALJ's overall finding that Plaintiff's severe physical functional limitations are inconsistent with her reports to her treating providers is supported by substantial evidence. Although Plaintiff received OMT treatment, emergency treatment, and medication management, none of these records indicate that Plaintiff mentioned she was so severely limited in her ability to stand or that she needed to routinely elevate her legs during the day due to back or leg pain. Instead, the one medical record in which Plaintiff reports elevating her legs was because she hurt her foot during a fall and so she was elevating her injured foot.[151] Likewise, the OMT provider that recommended that Plaintiff elevate her legs recommended only that she do so at nighttime.[152]

In addition, during the February 27, 2019 consultative evaluation with Dr. Cole, Plaintiff said that she lived alone and did her own cooking, chores, cleaning, and laundry, and fed her animals, including

---

[150] *See, e.g.*, AR 1094.

[151] AR 1130.

[152] AR 1112.

horses, chickens, cats, and dog.[153] These reports are consistent with statements to Dr. Osborn, during which she stated that she tripped over an electric fence and she assisted with painting at her house.[154] Also, in November 2019, Plaintiff advised another provider that she was "active taking care of her horses at home."[155] Although after the relevant period, Plaintiff sought emergency treatment for a hand injury in December 2021 after "she fell down while feeding her horses."[156]

Substantial evidence supports the ALJ's finding that Plaintiff's activity reports to providers conflict with those told to the ALJ.

### 6.    Reported mental-health symptoms

Objective medical evidence—signs, laboratory findings, or both— is a relevant factor for the ALJ to consider when assessing a claimant's

---

[153] AR 806.

[154] AR 1074, 1091.

[155] AR 1084.

[156] AR 2088.

symptoms.[157] An ALJ may consider discrepancies between a claimant's reported symptoms during the administrative process with the claimant's reports to treatment providers and the observations of the providers.[158] In addition, a claimant's course of treatment, including improvement with treatment, is a relevant factor for the ALJ to consider when assessing the claimant's symptom reports.[159]

Here, as mentioned above, treatment records reflect waxing and waning of Plaintiff's mental-health symptoms. Plaintiff was often observed with abnormal mental-health symptoms, but overall, the ALJ's evaluation of Plaintiff's presentation as "not severe" and that she

---

[157] 20 C.F.R. § 416.902(k, l); 3 Soc. Sec. Law & Prac. § 36:26, Consideration of objective medical evidence (2019).

[158] 20 C.F.R. § 416.929(c)(4). *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) (The ALJ may consider "ordinary techniques of credibility evaluation," such as prior inconsistent statements concerning symptoms").

[159] 20 C.F.R. § 416.929(c)(3).

typically presented with a better mental status than what Plaintiff testified to is supported by substantial evidence.

### 7.    Reported Physical Symptoms

While an ALJ may not "reject a claimant's subjective complaints based solely on lack of medical evidence to fully corroborate the alleged severity of pain," the ALJ may discount subjective complaints that are inconsistent with the objective medical evidence, so long as the ALJ explains why the objective medical findings are inconsistent with the claimant's complaints.[160]

Here, the ALJ found Plaintiff's reported extreme standing and lifting limitations inconsistent with the examinations revealing normal strength, a normal gait outside periods of acute injury, largely intact range of motion in the lumbar spine, only mild lumbar tenderness, good balance and coordination, normal sensation, intact cranial nerves, no joint deformity, and no neuro or motor deficits.[161] Substantial

---

[160] *Smartt*, 53 F.4th at 498 (quoting *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005)).

[161] AR 1211.

evidence supports the ALJ's finding that the objective medical evidence did not support the extent of Plaintiff's reported symptoms.

Moreover, any error in the ALJ's finding is eliminated by subsequent treatment records, which reveal that a cortisone injection in June 2011 alleviated Plaintiff's pain symptoms for more than a year.

**D.    RFC**

Plaintiff argues the ALJ failed to properly include all her limitations into the RFC. However, this argument depends on her contentions that the ALJ erred when evaluating her symptom reports and the medical opinions. Because, as discussed above, the ALJ's evaluation did not include consequential error, this RFC argument necessarily fails.[162]

Plaintiff also argues that the RFC's limit of occasional contact with a supervisor prevents Plaintiff from being able to advance past the training period of any job, thus precluding competitive employment. This argument is not supported by the vocational expert's testimony. The vocational expert testified that the identified jobs of

---

[162] *See Magallanes v. Bowen*, 881 F.2d 747, 756–57 (9th Cir. 1989).

DISPOSITIVE ORDER - 59

marker, routing clerk, and production assembler may require a short demonstration or an hour-long training session, with general check-in oversight by the supervisor as needed after that during the 30-day training period.[163]

Counsel then questioned whether an individual who needs to take a 20-minute break after every 20 minutes of training could perform competitive employment.[164] The vocational expert testified such an individual would be unable to perform competitive employment.[165] This hypothetical is a different scenario than the RFC's occasional-interaction limitation. Occasional interaction with a supervisor does not equate to the need to take a break every 20 minutes; instead, it means that Plaintiff's interactions with the supervisor would be limited to less than 1/3 of the workday. Plaintiff fails to establish error in this regard.

---

[163] AR 1254.

[164] AR 1254–55.

[165] AR 1255.

## IV.    Conclusion

Plaintiff fails to establish that the ALJ consequentially erred. The ALJ's nondisability findings are supported by explanation and substantial evidence.

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **AFFIRMED**.

2.    The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 11 and 19**, enter **JUDGMENT** in favor of the **Commissioner**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 23rd day of March 2026.

_Edward F. Shea_
_____
EDWARD F. SHEA
Senior United States District Judge

DISPOSITIVE ORDER - 61